**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TED BAXTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-CV-3818 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| SUN LIFE ASSURANCE COMPANY | ) | |
| OF CANADA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ted Baxter seeks judicial review of the final decision of Defendant Sun Life Assurance Company of Canada to offset Plaintiff's long-term disability benefits with a malpractice settlement that Baxter received from Evanston Hospital. The question before the Court is whether Sun Life's decision to offset Plaintiff's long term disability ("LTD") benefits by a portion of his tort settlement was arbitrary and capricious. For the reasons set forth below, the Court finds that Sun Life's decision was not reasonable in light of the plain language of Plaintiff's long-term disability policy. Therefore, the Court denies Defendant's motion for judgment under Federal Rule of Civil Procedure 52 [27] and enters judgment in favor of Plaintiff Ted Baxter.

**I.      Standard of Review**

Plaintiff's claim is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., which was "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). The statute permits a person who is denied

benefits under an ERISA employee benefit plan to challenge that denial in federal court. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); see also 29 U.S.C. § 1132(a)(1)(B). Both parties ask the Court to determine the question of Plaintiff's eligibility for benefits based on the case file reviewed by the Administrator and the proffered Program documents, as well as the deposition of Otis Robert Goodall, the claim consultant employed by Sun Life who adjudicated Plaintiff's claim.[1] See, *e.g., Cook Inc. v. Boston Scientific Corp.,* 333 F.3d 737, 741-42 (7th Cir. 2003) ("'Sometimes both parties move for summary judgment because they do not want to bear the expense of trial but instead want the trial judge to treat the record of the summary judgment proceeding as if it were the trial record. In effect, the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery.'") (quoting *May v. Evansville-Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1115 (7th Cir. 1986)); *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir. 2001) (deciding, in an ERISA case, that the applicable standard of review was the one found in Rule 52(a), where the parties stipulated to the facts that made up the administrative record, and "the procedure the parties followed * * * [was] more akin to a bench trial than to a summary judgment ruling."); *Akhtar v. Cont'l Cas. Co.,* 2002 WL 500544, at *1 (N.D. Ill. Apr. 1, 2002) (entering findings of fact and conclusions of law under Rule 52(a) in an ERISA case involving benefits eligibility). Thus, the Court will conduct a "paper" trial in which the Court reviews the record, and, in accordance with Rule 52 of the

---

[1] On May 20, 2010, the Court granted Plaintiff's motion to compel the deposition of Robert Goodall. In its ruling, the Court concluded that Plaintiff should be permitted to conduct limited discovery into the conflict of interest on the part of Sun Life under Rule 26(b). However, cognizant that the Seventh Circuit disfavors extensive discovery based on the discretion afforded plan administrators and ERISA's goals of inexpensive and expeditious resolution of benefits disputes (see *Semien v. Life Ins. Co. of North America*, 436 F.3d 805, 815 (2006)), the Court limited discovery to the deposition of Robert Goodall and directed the parties to tailor the discovery to the issue of the structural conflict of interest and its effect, if any, on the denial of benefits to Mr. Baxter.

Federal Rules of Civil Procedure, enters findings of fact and conclusions of law. See, *e.g.*, *Hess v. Hartford,* 274 F.3d 456, 461 (7th Cir. 2001) (describing procedure as "akin to a bench trial").

Generally, "[t]he standard of review of a Plan Administrator's decisions regarding benefits depends on whether the Plan Administrator was given the discretion to make those decisions." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004). The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In ruling on Plaintiff's motion to compel, the Court concluded that the language included in Plaintiff's policy—indicating that Sun Life's decisions are "conclusive and binding" and that judicial review will be subject to an "arbitrary and capricious" standard—gave Baxter adequate notice that the plan administrator had discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Thus, the Court determined that the appropriate standard for its review of Sun Life's benefits determination would be whether the plan administrator's decision was arbitrary and capricious.

## II.     Factual Findings[2]

On April 21, 2005, Plaintiff Ted Baxter, then a global controller at Citadel Investment Group, LLC ("Citadel"), became disabled as a result of brain damage following a cerebrovascular accident (a stroke). At the time that Plaintiff became disabled, he was insured under a group long term disability ("LTD") insurance policy provided by his employer and insured and underwritten by Defendant Sun Life Assurance Company of Canada. The policy

---

[2] Federal Rule of Civil Procedure 52 directs a Court to enter findings of facts and conclusions of law. To the extent that any conclusion of fact set forth below is more properly characterized as a conclusion of law, it should be so construed, and vice-versa with respect to conclusions of law. See, *e.g.*, *Marshall v. Blue Cross Blue Shield Ass'n*, 2006 WL 2661039, at *2 n.4 (N.D. Ill. Sept. 13, 2006).

promises to pay benefits based on an employee's past earnings minus any applicable offsets, so long as an employee remains disabled under the terms of the policy. Pursuant to the policy, total disability benefits are calculated by subtracting "Other Income Benefits" from the monthly benefit amount. The pertinent part of the policy regarding "Other Income Benefits" states:

> Other Income Benefits are those benefits provided or available to the Employee while a Long Term Disability Benefit is payable. These Other Income Benefits, other than retirement benefits, must be provided as a result of the same Total or Partial Disability payable under this Policy. Other Income Benefits include:

1.  The amount the Employee is eligible for under:
    a.  Workers' Compensation Law; or
    b.  Occupational Disease Law; or
    c.  Unemployment Compensation Law; or
    d.  Compulsory Benefit Act or Law; or
    e.  an automobile no-fault insurance plan; or
    f.  any other act or law of like intent.

2.  The Railroad Retirement Act (including any dependant benefits).

3.  Any labor management trustee, union or employee benefit plans that are funded in whole or in part by the Employer.

4.  Any disability income benefits the Employee is eligible for under:
    a.  any other group insurance plan of the Employer;
    b.  any governmental retirement system as a result of the Employee's job with his Employer.

5.  The benefits the Employee receives under this Employer's Retirement Plan as follows * * * *

6.  The disability or retirement benefits under the United States Social Security Act, or any similar plan or act as follows * * * *

7.  The amount the Employee receives from any accumulated sick leave.

8.  Any salary continuation paid to the Employee by his Employer which causes the Net Monthly Benefit, plus Other Income Benefits and any salary continuation to exceed 100% of the Employee's Total Monthly Earnings * * * *

9.     Any amount due to income replacement or lost wages the Employee receives by compromise, settlement or other method as a result of a claim for any Other Income Benefit.

10.     Any amount the Employee receives from a voluntary separation of employment agreement with the Employer including severance pay or any other income in settlement of an employment contract.

Initially, Sun Life paid Plaintiff a next monthly benefit of $15,000.00. Then, on December 4, 2005, Plaintiff was awarded Social Security Disability Income Benefits ("SSDIB"), which dated back to April 21, 2005. Sun Life subsequently offset Plaintiff's monthly LTD benefit amount by the amount of his SSDIB, which was approximately $2,133.00, reducing Sun Life's monthly payout to $12,867.00.

Then, in November 2006, Plaintiff brought suit against Evanston Hospital for medical malpractice relating to the treatment Plaintiff received for the stroke he suffered. The Baxters alleged that as a result of the hospital's negligent treatment of Plaintiff after his April 2005 stroke, Plaintiff suffered "injuries of a personal and pecuniary nature." In March 2007, Plaintiff and Evanston Hospital settled for approximately $19,500,000.00. The settlement agreement did not enumerate a payment for loss of wages, but rather stated only the gross amount of the settlement. Sun Life obtained a copy of Baxter's malpractice complaint, as well as the settlement agreement, answers to interrogatories, Mrs. Baxter's deposition, and the mediation statement. The mediation statement listed Plaintiff's damages to include disability, loss of normal life, disfigurement, lost income, loss of society, physical pain, and mental suffering. The statement included a report entitled Ted Baxter Economic Loss, which showed net past lost income as of March 19, 2007 to be $997,342 and estimated future lost income at between $28 million and $63 million.

In a letter dated April 18, 2008, Robert Goodall notified Plaintiff that Sun Life had determined that the medical malpractice settlement would offset his monthly LTD benefit amount pursuant to the policy's definition of "Other Income Benefits"—specifically, the provision which allows an offset against monthly benefits payable for "any amount you receive due to income replacement or lost wages paid to you by compromise, settlement, or other method as a result of a claim for any Other Income Benefit." Mr. Goodall determined that "the vast majority of Mr. Baxter's claims relate to his lost wages" and applied one-third of the $19.5 million settlement in his calculation of the offset. More specifically, Mr. Goodall stated that:

> The preliminary Economic Loss Report indicated that as of March 19, 2007, Mr. Baxter had a 'net past lost income' of $997,342 and 'net future lost income' ranged from $28,943,212 to $63,248,192. In contrast, the 'known specials' as of March 19, 2007, including patient out of pocket medical expenses totaled only $76,344.88 * * * Although the financial settlement was not itemized, given the claims outlined in the documents you provided and the clear focus on the very substantial loss of earnings, it appears that the $19,500,000 settlement recovered under an Illinois Medical Malpractice claim was based in large part on the reported lost income.

Mr. Goodall recalculated the net benefit based on the offset created by the settlement. To determine the monthly amount of the offset, Mr. Goodall took one-third of the $19.5 million settlement and divided that amount by 283 months.[3] Mr. Goodall calculated the amount of the monthly offset of LTD benefits based on the settlement to be $22,965.90. Because this amount exceeded the gross monthly benefit (which also took into account the SSDIB offset), Sun Life determined that Plaintiff was eligible only for the minimum monthly benefit of $1,500. Further, because the LTD benefit payments made to Plaintiff through March 31, 2008, had not been offset based on the amount of the settlement, Mr. Goodall determined that Plaintiff had been

---

[3] 283 months was the period from the April 22, 2005 onset of disability through the maximum benefit duration of November 17, 2028, the date that Plaintiff will turn age 65.

overpaid $375,480.00 in LTD benefits, and Sun Life requested that Baxter reimburse Sun Life the full amount of the overpayment. Mr. Goodall requested a response within 30 days concerning the reimbursement, and stated that if a response was not forthcoming, Sun Life would begin to reduce the amount of the overpayment from the monthly benefit as provided under the Policy.

Plaintiff timely appealed, challenging Defendant's offset determination and seeking reinstatement of benefit payments at the full amount. In July 2008, Brian Sullivan, a Sun Life "appeal specialist," forwarded Plaintiff's claim file to David C. Jensen, a litigation attorney with a "special emphasis on professional liability and commercial litigation."[4] Mr. Sullivan asked Mr. Jensen to review the documents and provide a professional opinion on whether it is "reasonable to conclude that no portion of [Plaintiff's] Medical Malpractice Settlement represents lost income and/or income replacement, as has been suggested by [Plaintiff's] counsel." Mr. Sullivan also asked Mr. Jensen to give an opinion about what amount of the settlement likely represented a recovery for lost income, in the event that he concluded that a portion of the settlement represented lost income/income replacement. On July 23, 2007, Mr. Sullivan telephoned Plaintiff's counsel to inform him that Sun Life was obtaining a legal opinion from a medical malpractice attorney. Plaintiff's counsel agreed to an extension for the decision provided that he was given an opportunity to review and respond to the opinion.

Mr. Jensen prepared a written opinion dated August 12, 2008. Mr. Jensen stated that he focused his review on the malpractice complaint, Plaintiff's discovery responses, the mediation statement (and its supporting exhibits), and medical records. In his August letter, Mr. Jensen

---

[4] Sun Life did not seek professional or expert opinions prior to rendering its initial determination regarding Baxter's medical malpractice settlement.

opined that the amount of the settlement "was significantly influenced by [Plaintiff's] high earning capacity."  According to Mr. Jensen:

> While his stroke was initially disabling, [Plaintiff's] recovery has been excellent, his disfigurement non-existent, and his physical rehabilitation relatively quick and successful.  His medical bills are very small and I see nothing that suggests significant medical expenditures in the future. The substantial settlement he actually received—$13 million after payment of attorneys fees and expenses—was driven by his lost future income.

Mr. Jensen observed that at the time of Plaintiff's stroke, he was making $1.3 million per year and had an established earning history at two previous jobs.  Mr. Jensen observed that Dr. Skurski's Economic Loss Report showed Plaintiff's net past loss of income of $997,342 and future lost income ranging from $28,943,212 to $63,248,192, depending on whether Plaintiff remained in the job he had at the time of his stroke or received promotions.  In rendering his opinion, Mr. Jensen reviewed recent settlements and verdicts from Cook County "to help assess the role lost earnings likely played in this matter."  Mr. Jensen noted that Plaintiff received a settlement that was $2 million more than a severely injured former model, and he concluded this greater amount was "based on his income loss."  Mr. Sullivan faxed Mr. Jensen's August letter to Plaintiff's counsel on September 2, 2008.

On January 28, 2009, Baxter submitted additional documentation to Sun Life, including an expert witness report prepared by Neil Posner that challenged Sun Life's position concerning the application of the malpractice settlement proceeds to offset the LTD benefit.  The report concluded that an uncategorized settlement of a suit for personal injuries alleging bodily injury does not constitute income replacement or payment of lost wages.  Mr. Sullivan forwarded Mr. Posner's letter to Mr. Jensen for his review and asked whether Mr. Posner's letter changed Mr. Jensen's opinions.  Mr. Jensen responded that his opinion remained unchanged, citing the Economic Loss Report that was part of the Baxters' Mediation Statement and stating that the

evaluation "absolutely builds" on the impact that Plaintiff's stroke had on his ability "to maintain his high level of income."  Mr. Jensen also stated that Plaintiff "is not the victim of a stroke the cause of which is likely to repeat itself" and that the "principle risk factor for recurrent stroke has been dramatically reduced, if not eliminated."  Mr. Jensen stated that he could not comment on the tax issues raised in Mr. Posner's letter.

In June 2009, Mr. Sullivan asked James McElligott, Jr., an attorney that who handles employment, executive compensation, and benefits matters, to address the tax issues raised by Posner's report.  In his June 2009 opinion letter, Mr. McElligott stated that Sun Life had asked him to address two contentions regarding tax law that Mr. Posner raised:  (1) that Sun Life should not be allowed to treat as income that which the IRS does not; and (2) that Sun Life should be estopped from taking a position that puts * * * [Plaintiff] in peril of additional tax liability.  Mr. McElligott's opinion disagreed with Mr. Posner's contentions, stating that "Sun Life's characterization of the settlement proceeds for purposes of honoring its obligations under the policy should not impact the insured treatment of the settlement proceeds for federal income tax purposes."

Mr. Sullivan also asked George J. DiDonna, M.D. FACC (Board Certified in Cardiology) to review Mr. Jensen's August and May Letters and Plaintiff's medical records and provide his opinion concerning whether Mr. Jensen's opinion about Plaintiff's future medical expenses was reasonable.  Dr. DiDonna agreed with the explanation and conclusions of Mr. Jensen regarding "the mechanism of the CVA [stroke]" in Plaintiff's case.  Dr. DiDonna also stated that Plaintiff would not be "at high risk of repeated embolic CVA [stoke] as evidenced by his medical treatment * * *."  On June 16, 2010, Sun Life faxed to Plaintiff's counsel Mr. Jensen's May

Letter, Mr. McElligott's letter, and Dr. DiDonna's report. In response, Plaintiff filed the present lawsuit.

Sun Life denied Plaintiff's appeal by letter dated July 8, 2009. Mr. Sullivan stated that Sun Life was applying two "Other Income Benefits" offsets to Plaintiff's monthly long term disability benefit: Plaintiff's $2,049.00 monthly SSDI benefit and $22,965.90 per month for income replacement or lost wages received by settlement. Mr. Sullivan noted that Sun Life sought an additional review by Mr. Jensen, as well as reviews by Dr. DiDonna and Mr. McElligott. The letter concluded that:

> Upon consideration of all opinions obtained during this appeal review, it is Sun Life's determination that the settlement awarded to Mr. Baxter is an offset under the Policy because the settlement included an amount due to income replacement under medical malpractice law. Sun Life has not used the total amount of Mr. Baxter's settlement as an Other Income offset and does not argue that no portion of this is for either personal injury sustained or anticipated future medical expenses. Considering Mr. Baxter's current medical status and the anticipated future medical expenses he faces, Sun Life is attributing only 33% of his total award to income replacement. Sun Life will not, therefore, reverse its position regarding the offsets applicable to Mr. Baxter's monthly long term disability benefit.

The appeal denial letter stated that in light of the "Other Income Benefit" offsets, Plaintiff is due the Minimum Monthly Benefit payable under the Policy ($1,500.00), and because Plaintiff did not provide Sun Life with timely notice of "all Other Income Benefits Mr. Baxter receives," he was overpaid LTD benefits in the amount of $378,480.00. The appeal denial letter requested that Plaintiff reimburse the amount of the overpayment, and if he did not do so, Sun Life stated it would withhold future monthly benefits and "credit them against the overpayment until the overpayment is satisfied." Plaintiff has not reimbursed Sun Life.

As previously stated, the Court granted Plaintiff's motion to compel the deposition of Robert Goodall in order to allow the parties to conduct limited discovery into a conflict of

interest on the part of Sun Life.  During his August 2010 deposition, Goodall testified that he applied an offset of Baxter's malpractice settlement, deeming such payment "Other Income Benefits."  Plaintiff's counsel asked if he had ever applied paragraph 9 of the "Other Income Benefits" section of the Policy "to a claim that involved personal injury other than in the context of workers' compensation," and Mr. Goodall responded that he had not.  He also testified that he did not review any external documents describing the malpractice lawsuit settlement and its impact on Baxter's benefits other than Baxter's LTD policy with Sun Life and the settlement document which released all claims against the defendant in Baxter's malpractice lawsuit. Goodall acknowledged that the settlement/release document did not contain any statement which specifically denominated any of the payment identified in the documents as being attributable to "replacement of income or lost wages."

When asked to explain why he chose one-third as the amount attributable to "lost wages," Goodall answered:  "I can't recall specifically how one-third was determined other than to say that I felt it was a conservative estimate based on my review of the complaint documents that were provided."  Goodall also did not recall why he did not subtract attorneys' fees and other expenses from the gross settlement amount of $19.5 million prior to applying a one-third offset to the malpractice settlement.

## III.     Analysis

Review under the deferential standard—whether the administrator's decision was arbitrary and capricious—"is not a rubber stamp" (*Holmstrom v. Metropolitan Life Ins. Co*., 615 F.3d 758, 766 (7th Cir. 2010)), and courts should not uphold a termination "when there is an absence of reasoning in the record to support it" (*Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774-75 (7th Cir. 2003).   The Seventh Circuit has advised lower

courts to focus on "procedural regularity, substantive merit, and faithful execution of fiduciary duties" in considering whether an administrator decision was arbitrary and capricious. *Holmstrom*, 615 F.3d at 766. An administrator's conflict of interest is a "key" consideration under this deferential standard. *Id.* Courts are to remain "cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (citing *Glenn,* 554 U.S. at 111)). In such cases, like the present one, the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion."[5] See *Glenn,* 554 U.S. at 111 (internal quotations omitted).

The fundamental question before the Court is whether it was reasonable for Sun Life to conclude, under the terms of its policy, that the Baxters' malpractice settlement constituted an "Other Income Benefit." As pointed out by Sun Life, under the deferential standard of review, "an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language." *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009). Attempting to minimize the deference given to an administrator's interpretation, Plaintiff maintains that the rule of *contra proferentem* applies in this case—in other words, that ambiguous terms should be construed in favor of beneficiaries. But not according to the Seventh Circuit:

> When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no

---

[5]   For ERISA purposes, "the arbitrary-and-capricious standard * * * is synonymous with abuse of discretion * * *." *Raybourne v. Cigna Life Ins. Co. of New York,* 576 F.3d 444, 449 (7th Cir.2009). The Seventh Circuit recently noted that while "[n]it-pickers might argue that there is a distinction between the two standards, but they are simply different ways of saying the same thing." *Holmstrom*, 615 F.3d at 767 (quoting *Jenkins,* 564 F.3d at 861 n.8) (internal quotation marks omitted).

> occasion to employ the rule of *contra proferentem.* Deferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry—the construction of someone else's construction.

See *Morton v. Smith*, 91 F.3d 867, 871 (7th Cir. 1996); see also *Marrs v. Motorola, Inc.* ("Thus, as we explained in *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1011 (7th Cir. 1998), 'although, generally, ambiguities in an insurance policy are construed in favor of an insured, in the ERISA context in which a plan administrator has been empowered to interpret the terms of the plan, this rule does not obtain.'"). Although interpretations that "controvert the plain meaning of a plan" may be overturned (see *Green v. UPS Health and Welfare Package for Retired Employees*, 595 F.3d 734, 738 (7th Cir. 2010)), district courts in this circuit do not employ the rule of *contra proferentem* when undertaking deferential review of a plan administrator's decision.

Sun Life maintains that it was "reasonable" to offset Plaintiff's disability benefits with a portion of the gross malpractice settlement (without considering the attorney's fees incurred by Plaintiff) because the malpractice settlement constituted an "Other Income Benefit" under Plaintiff's LTD policy. Sun Life relies on paragraphs 1 & 9 of the "Other Income Benefits" section of the Policy. First, Defendant contends that it was reasonable for Sun Life to offset Mr. Baxter's malpractice settlement against his LTD benefits because paragraph 1 of the "Other Income Benefits" section of the policy defines "Other Income Benefits" as "[t]he amount the Employee is eligible for under * * * [a]ny other act or law of like intent." According to Defendant, Plaintiff's malpractice recovery was obtained through "any other act or law of like intent" because all of the laws listed in paragraph 1 (i.e., (Workers' Compensation Law, Occupational Disease Law, Unemployment Compensation Law, Compulsory Benefit Act or Law, and an automobile no-fault insurance plan) compensate an injured person for lost income.

Defendant further contends that the offset was appropriate under paragraph 9 of the "Other Income Benefits" section of the policy which allows for an offset of "[a]ny amount you receive due to income replacement or lost wages paid to you by compromise, settlement or other method as a result of a claim for any Other Income Benefit." Defendant maintains that Plaintiff's malpractice settlement was an amount he received "due to income replacement or lost wages paid * * * by settlement" as a result of a claim under a law of "like intent" when compared with the laws listed in paragraph 1.

Based on the language of the policy, unless Plaintiff's malpractice claim arose under one of the enumerated classifications of "Other Income Benefits," there is no basis to permit Sun Life to take an offset. Although tort claims are not specifically listed in paragraph 1, Defendant maintains that Plaintiff's malpractice settlement was designed to compensate Baxter for his lost income and thus is akin to the specific laws listed in paragraph 1. However, Defendant's construction simply is not supported by the policy terms. Most obviously, the laws listed in paragraph 1 arise from statutes; a malpractice claim arises from common law negligence. But even more telling is the fact that a malpractice claim clearly is a fault-based, common-law tort action. All of the statutes listed in paragraph 1 provide for no-fault recovery, as opposed to the proof of negligence standard that must be met in a malpractice action. See, *e.g.*, *Luna v. U.S.*, 454 F.3d 631, 634 (7th Cir. 2006) ("Under workers' compensation statutes, employers are relieved of the risk of large damages verdicts in tort lawsuits arising from accidental workplace injuries, and employees receive the benefit of no-fault recovery."). It is hard to image a tort claim such as medical malpractice being of "like intent" with no-fault laws such as worker's compensation, unemployment compensation, or occupational disease, given that the limit on damages in these laws is *in exchange for* the elimination (in most instances) of general tort rules

and defenses. See, *e.g.*, *Spearman v. Exxon Coal USA, Inc.*, 16 F.3d 722, 724 (7th Cir. 1994) (noting that tort of retaliatory discharge lacks the essential elements of a no-fault law such as worker's compensation law); see also *Handley v. Unarco Industries, Inc.*, 463 N.E.2d 1011, 1022 (Ill. App. Ct. 4th Dist. 1984) ("The Workers' Occupational Diseases Act, like the Workers' Compensation Act, establishes a system of liability without fault, and abolished traditional defenses available to the employer in exchange for the prohibition against common-law suits by employees * * * *").

Defendant's position that insurance companies can include provisions requiring other lost wage recoveries to be offset against benefits payable under the LTD policy is sound. See, *e.g.*, *Hall v. Life Ins. Co. of N. America*, 317 F.3d 773, 775 (7th Cir. 2003) (discussing reasons for income offset provisions). These clauses "not only reduce the employer's outlay for disability coverage (and thus enable the employer to provide additional fringe benefits from a given budget) but also control the moral hazard of insurance—that is, the chance that the existence of insurance will increase the likelihood of the insured event." *Id.* But as *Hall* indicates, deductions generally are not "universal," and the policy documents must support the company's reading. *Id.* Here, the plain language of the policy does not support Defendant's view that a malpractice recovery that arose out of a tortious act is "like" state-mandated, no-fault recoveries that traditionally arise after a disability. Put another way, a malpractice recovery is not a typical "income benefit" which foreseeably results from a disabling stroke.[6]

---

[6] In fact, Baxter's malpractice recovery arose out of allegedly negligent medical care that he received *after* he suffered the stroke. In other words, there is no contention that the medical care in any way caused the stroke from which the parties agree (see Pl. Proposed Findings ¶ 10; Def. Answer ¶ 9) Baxter sustained permanent brain damage that prevents him from working.

As noted above, the Seventh Circuit does not recognize the rule of *contra proferentem* during a deferential review. See *Marrs v. Motorola, Inc*., 577 F.3d at 786-87. But even if the rule were in play, there would be no need to invoke it in this instance, for applying an offset for a medical malpractice recovery is contrary to the plain meaning of the plan. Nothing in the plan language gives the employee any indication that tort recoveries will be considered an "Other Income Benefit." As the drafter, Sun Life had the ability to draft its policy to specifically allow it to offset a specified percentage of personal injury or tort settlements. See, *e.g.*, *In re Unisys Corp. Long-Term Disability Plan ERISA Litigation*, 97 F.3d 710, 715 (3d. Cir. 1996) ("It is a simple task of draftsmanship to specify which offsets are applicable in any particular plan."). For instance, a comparable policy drafted by Unum Life, one of Sun Life's competitors, demonstrates that if Sun Life's intent had been to offset a personal injury recovery, it easily could have been accomplished. Unum's policy provides: "Unum will subtract from your gross disability payment the following deductible sources of income: * * * 7. The amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise." This broad language is only one example of how an insurance company could draft a provision that accounts for recoveries that arise out of tort claims. Had this language or comparable terms been used, Plaintiff almost certainly would have been unable to present a persuasive argument that the offset was an abuse of the insurer's discretion since language of this sort clearly states that any third party recovery could be offset (less attorney's fees). Instead, the Sun Life policy explicitly allows an offset for statutory-based, no-fault recoveries, but leaves a participant to wonder what additional laws are encompassed by the phrase "laws of like intent."

Sun Life's attempt to cram the common law of negligence in tort within the language of its policy cannot be sustained, even under a deferential standard of review.[7]

One of the primary statutory goals of ERISA is to insure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 575 F. Supp. 2d 892, 916 (N.D. Ill. 2008) (quoting *Int'l Union of Electronic, Elec., Salaried, Machine and Furniture Workers, AFL-CIO v. Murata Erie North America, Inc.*, 980 F.2d 889, 907 (3d Cir.1992)). If policy language is in fact ambiguous, then the subjective intent of the policy sponsor might, along with other evidence,[8] be relevant in ascertaining its meaning. However, without a textual basis in the plan for an administrator's decision to offset Plaintiff's long-term disability benefits by amounts that he received through a settlement of a medical malpractice claim, the subjective intent is

---

[7] Furthermore, even if tort recoveries were of "like intent" to the statutes listed in paragraph 1—and the Court concludes that they are not—paragraph 9 specified that the amount of the offset would be limited to "[a]ny amount due to income replacement or lost wages the Employee *receives* by compromise, settlement or other method as a result of a claim for any Other Income Benefit." As noted above, the administrator's decision offset Plaintiff's LTD benefits by one-third of his *gross* settlement. Even putting aside the administrator's admission that he arbitrarily selected one-third of the gross recovery—a decision that may have been reasonable had the policy language permitted a set off for medical malpractice actions in the first place—the decision to offset the gross amount also conflicts with the policy terms. In deciding to offset one-third of the gross settlement amount of $19 million, rather than 1/3 of the $12 million that Plaintiff actually *received* (the gross settlement minus attorney's fees and expenses), the administrator's decision contravened the explicit terms of the plan.

[8] Here, Defendant contends that its subjective intent can be gleaned from Sun Life's Business Process and Procedures Reference Guide which provides that "[i]ncome replacement by compromise, settlement, etc. * * * includes Worker's Comp, motor vehicle accidents, slip and fall lawsuits, etc." Defendant maintains that these internal claim handling guidelines are consistent with Sun Life's decision to include tort settlements as "Other Income Benefits." Aside from the obvious problem with this evidence—that Plaintiff had no knowledge of it prior to signing the policy for LTD benefits—Defendant has failed to demonstrate that an ambiguity exists such that resort to extrinsic evidence is warranted. See *Swaback v. American Info Techs. Corp.*, 103 F.3d 535 (7th Cir. 1996) (extrinsic evidence should not be used where the contract is unambiguous). Additionally, Sun Life's internal reference guide directs the claim examiner to obtain a copy of the complaint and determine the "litigation amount" as it relates to "income replacement by compromise, settlement, etc." However, the policy limits the "offset" to "income replacement received by compromise or settlement" as a result of a claim for "Other Income Benefit." The policy itself does not allow an offset generally to "any amount received by compromise or settlement."

irrelevant. Here, the plain language of the policy did not give Plaintiff the appropriate information to order his affairs, such as structuring his malpractice settlement. For instance, Defendant's own facts acknowledge that Plaintiff's projected future income could have exceeded $60,000,000.00. While the $12 million Plaintiff received from his tort settlement is a king's ransom to most, it is approximately one-fourth of the high end of Baxter's projected future wages and only half of the low end. Based on the language in the policy, the nearly $13,000 per month payout that Plaintiff received from his LTD policy easily could have influenced his decision to accept the malpractice settlement. Without a textual basis in the policy to indicate that his tort recovery could offset his LTD benefits, Plaintiff was ill-prepared to construct his malpractice recovery to take into account the offset.

A final note regarding the structural conflict of interest mentioned above: As discussed above, a structural conflict of interest may come into play where the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay those benefits. *Glenn,* 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009). "A structural conflict is one factor among many that are relevant in the abuse-of-discretion analysis * * * and will 'act as a tiebreaker when the other factors are closely balanced.'" *Raybourne,* 576 F.3d at 449 (quoting *Glenn,* 554 U.S. at 117). A detailed analysis of any potential conflict of interest at work here is unnecessary, as the Court finds that the administrator's decision was not supported by the plain language of the policy. That being said, the Court briefly comments on some of the factors present in this case that suggest that a conflict of interest may have been at work. See, *e.g.*, *Holmstrom v. Metropolitan Life Ins. Co*., 615 F.3d 758, 777 (7th Cir. 2010).

First, Sun Life's decision not to use experts in making its initial determination, but only in defending its claim administrator's admittedly imprecise offset,[9] suggests the possibility of a conflict of interest. Additionally, testimony from the administrator during his deposition that he had never applied paragraph 9 of the "Other Income Benefits" section of the policy "to a claim that involved personal injury other than in the context of workers' compensation" tends to raise the eyebrows in respect to a conflict of interest analysis. Mr. Goodall also testified that he did not review any external documents describing the malpractice lawsuit settlement and its impact on Baxter's benefits other than Baxter's LTD policy with Sun Life and the settlement document which released all claims against the defendant in Baxter's malpractice lawsuit. Finally, Goodall's decision not to subtract attorneys' fees and other expenses from the gross settlement amount of $19.5 million prior to applying a one-third offset to the malpractice settlement would be a reason to give more weight to the conflict factor—particularly in view of the policy language focusing on income or wages *received* by the claimant. In sum, viewing all of these factors in conjunction with the administrator's interpretation of the policy language, had resort to a conflict of interest tie-breaker been necessary, it would have favored Plaintiff here.

In sum, Sun Life's application of the offset under paragraph 1(f) of the "Other Income Benefits" section lacked a "reasoned basis," as tort law is not a law of "like intent" when compared with the laws listed under paragraph 1(a)-(e). See *Call*, 475 F.3d at 821-22 (refusing to adopt plan administrator's self-serving plan interpretation, despite the deferential review, because the interpretation lacked a "reasoned basis."). Nor did the malpractice claim fall within the scope of any of the other provisions set forth in paragraphs 2 through 10, such as Social

---

[9] When asked to explain why he chose one-third as the amount attributable to "lost wages," Goodall answered: "I can't recall specifically how one-third was determined other than to say that I felt it was a conservative estimate based on my review of the complaint documents that were provided."

Security disability, pension, sick leave, salary continuation, or severance pay. Because Sun Life did not have a reasoned basis for concluding, under the terms of its own policy, that the Baxters' malpractice settlement constituted an "Other Income Benefit," the decision to offset Plaintiff's long term disability ("LTD") benefits by a portion of his tort settlement was arbitrary and capricious. [10]

## IV.    Conclusion

Because the Court finds that Sun Life's decision to offset Plaintiff's long term disability ("LTD") benefits by a portion of his tort settlement was arbitrary and capricious in light of the plain language of Plaintiff's long-term disability policy, the Court denies Defendant's motion for judgment under Rule 52 [27] and enters judgment in favor of Plaintiff Ted Baxter and against Defendant Sun Life. The Court orders restoration of monthly benefit payments to the pre-offset amount ($12,951.00) retroactive to April 18, 2008. Plaintiff is not liable for the claimed overpayment in the amount of $375,480.00.

Plaintiff also seeks costs, attorney fees, and prejudgment interest on benefits due since April 2008. In a beneficiary's ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Seventh Circuit reviews a district court's decision to award or deny attorney fees for abuse of discretion, and will not disturb the district court's finding "if it has a basis in reason." *Bowerman v. Wal-Mart Stores, Inc.,* 226 F.3d 574, 592 (7th Cir. 2000). Whether to award an ERISA claimant prejudgment

---

[10]   Had Sun Life classified all tort recoveries as an offset, this likely would have been a different case. Plaintiff maintains that because his malpractice settlement documents did not contain any statement that denominated any portion of the malpractice settlement as "income replacement or lost wage," Sun Life was unreasonable in determining that a portion of the settlement was received due to lost wages. However, accepting Plaintiff's view that uncategorized settlements could never be subject to an offset would create an incentive for parties to structure (or at least categorize) strategically to avoid an offset actually provided for in an ERISA plan.

interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Fritcher v. Health Care Service Corp.,* 301 F.3d 811, 820 (7th Cir. 2002). Neither party has briefed the issue of attorney's fees and prejudgment interest. In the event that the parties are unable to resolve the issue of fees, costs, and pre-judgment interest without court intervention, Plaintiff may file an appropriate request at that time. See, *e.g.,* *National Production Workers Union Ins. Trust v. Life Ins. Co. of North America,* 2010 WL 2900325 (N.D. Ill. July 21, 2010); see also *Holmstrom v. Metropolitan Life Ins, Co.,* 2011 WL 2149353 (N.D. Ill. May 31, 2011).

Dated: June 7, 2011

_____
Robert M. Dow, Jr.
United States District Judge